**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RANDALL MILLER, ISABEL SIPPO-STOCKMAN, JOSEPH JACKSON, BENJAMIN TATE, BRANDY GARNER, STEPHEN PRITCHETT, SAMIRA SEGRETI, and REX WAER individually and as the representatives of classes of similarly situated persons, | Case No.: 1:25-cv-13474 |
| Plaintiffs, | Honorable LaShonda A. Hunt |
| v. | |
| BATCHSERVICE LLC D/B/A BATCHDATA, a Delaware Limited Liability Company, | |
| and | |
| EQUIMINE INC. D/B/A PROPSTREAM, a California corporation, | |
| Defendants. | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Randall Miller ("Miller"), Isabel Sippo-Stockman ("Sippo-Stockman"), Joseph Jackson ("Jackson"), Benjamin Tate ("Tate"), Brandy Garner ("Garner"), Stephen Pritchett ("Pritchett"), Samira Segreti ("Segreti"), and Rex Waer ("Waer") bring this action on behalf of themselves, and all other persons similarly situated, and allege the following against Defendant BatchService LLC d/b/a BatchData ("BatchService") and Defendant Equimine Inc. d/b/a PropStream ("Equimine") (collectively, "Defendants").

## NATURE OF ACTION

1. Plaintiffs and members of the proposed classes (the "Classes") seek statutory damages, an injunction, and other relief from Defendants for violations of their right of publicity

as protected by statutes in the following states: Illinois, California, Indiana, and Alabama.

2. As discussed in detail below, Illinois, California, Indiana, and Alabama prohibit the use of an individual's name and other personal identifying information for commercial purposes without first obtaining consent, written or otherwise. *See* Illinois Right of Publicity Act ("IRPA"), 765 ILCS § 1075/1 *et seq.*; California Civil Code § 3344, *et seq.*; Indiana Publicity Code, IC 32-36-1 *et seq.*; and Alabama Right of Publicity Act ("ARPA") Ala. Code § 6-5-770 *et seq*.

3. Defendants provide software for various real estate professionals such as real estate investors, agents, and mortgage lenders. One of Defendants' products is BatchLeads, an online platform that enables users to "identify and engage property owners" by gathering and making searchable the personal information of property owners, including a property owner's full name, address, and phone number, and the property's purchase date and price.[1] This information enables users to accurately identify individual property owners contained on the BatchLeads platform. Indeed, Defendants maintain that BatchLeads provides users with the "data, tools, and insights you need to generate targeted leads, connect with property owners, and close more deals."[2]

4. Defendants offer a 7-day free trial to the BatchLeads platform, allowing users access to property owners' identifying information. The purpose of providing a free trial and free access to the identifying information contained on the platform is to market paid subscriptions for the platform. In other words, Plaintiffs' and the Class members identities are held out by Defendants to market the BatchLeads platform.

---

[1] Information from Defendants' website, batchleads.io, last visited on December 31, 2025.

[2] *Id.*

5. Plaintiffs and the Classes have no relationship with Defendants. They do not and have not subscribed to or used the BatchLeads platform. More importantly, Plaintiffs and the Classes never provided Defendants with consent, written or otherwise, to use their identities to advertise paid for subscriptions to the BatchLeads platform.

6. Despite failing to obtain consent, written or otherwise, from Plaintiffs and the Classes, Defendants nevertheless utilized their personal identifying information for the purpose of enticing users of the BatchLeads platform to enter into paid premium subscriptions for additional access to the platform. In other words, Defendants used and held out Plaintiffs' and other Class Members' identities for commercial purposes without their permission in violation of the various right of publicity statutes.

7. Plaintiffs bring this Complaint seeking an order (i) declaring that Defendants' conduct violates the aforementioned state statutes, (ii) requiring that Defendants cease the unlawful activities described herein, (iii) awarding Plaintiffs and the proposed Classes statutory damages in an amount prescribed by statute per violation or an amount equal to actual damages/profits, whichever is greater, and (iv) an award for punitive damages, if warranted, and attorneys' fees and costs.

## PARTIES

8. Plaintiff Randall Miller is a citizen of the State of Illinois residing in DuPage County, Illinois.

9. Plaintiff Isabel Sippo-Stockman is a citizen of the State of Illinois residing in Madison County, Illinois.

10. Plaintiff Joseph Jackson is a citizen of the State of California residing in Sonoma County, California.

11. Plaintiff Benjamin Tate is a citizen of the State of California residing in Santa Barbara County, California.

12. Plaintiff Brandy Garner is a citizen of the State of Indiana residing in Marion County, Indiana.

13. Plaintiff Stephen Pritchett is a citizen of the State of Indiana residing in Hamilton County, Indiana.

14. Plaintiff Samira Segreti is a legal resident of the State of Alabama residing in Shelby County, Alabama.

15. Plaintiff Rex Waer is a citizen of the State of Alabama residing in Lee County, Alabama.

16. Defendant BatchService is a Delaware limited liability company with its principal place of business located in Tempe, Arizona. BatchService knowingly and deliberately seeks out and compiles identifying information of Illinois, California, Indiana, and Alabama citizens and residents and knowingly and deliberately uses that information to market its monthly or yearly subscriptions for its BatchLeads platform to Illinois, California, Indiana, and Alabama citizens and others without consent.

17. Defendant Equimine is a California corporation with its principal place of business located in Lake Forest, California. On July 7, 2025, Equimine d/b/a PropStream announced its acquisition of BatchLeads and BatchDialer, a premier AI-powered lead generation and marketing platform for real estate professionals and investors. Equimine knowingly and deliberately seeks out and compiles identifying information of Illinois, California, Indiana, and Alabama citizens and residents and knowingly and deliberately uses that information to market its monthly or yearly subscriptions for the BatchLeads platform to Illinois, California, Indiana, and Alabama citizens and others without consent.

## JURISDICTION AND VENUE

18. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2) (the "Class Action Fairness Act") because sufficient diversity of citizenship exists between the parties – Plaintiffs are citizens of several states and Defendant BatchService is a limited liability company with its principal place of business located in Tempe, Arizona, and Defendant Equimine is a California corporation with its principal place of business located in Lake Forest, California. Further, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, with at least 100 or more potential Class Members based on the number of individuals identified through the BatchLeads platform and the damages available through the various statutes.

19. This Court has personal jurisdiction over Defendants because they conduct significant business in this District, and the unlawful conduct alleged in the Complaint occurred in and/or was directed to it. Defendants knowingly and deliberately sought out and compiled the names and other identifying information of Plaintiff Randall Miller and other putative Class members residing in this District and used that information for marketing to Illinois citizens and others without written consent. In so doing, Defendants' statutory violations related to the matters complained of herein occurred in this District.

20. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims of Plaintiffs Miller and Sippo-Stockman and other putative Class members occurred in this District. Defendants, through their proprietary platform, collected and used Miller's, Sippo-Stockman's, and other putative Class members' personal information for commercial purposes without their consent. In so doing, Defendants violated their right of publicity, as well as the right of publicity of other putative Class Members residing in this District.

## ILLINOIS RIGHT OF PUBLICITY ACT

21. IRPA was enacted in 1999 to recognize individuals' "right to control and to choose whether and how to use [their] individual identity for commercial purposes." 765 ILCS § 1075/10.

22. IRPA defines "identity" as "any attribute of an individual that serves to identify that individual to an ordinary, reasonable viewer or listener, including but not limited to (i) name, (ii) signature, (iii) photograph, (iv) image, (v) likeness, or (vi) voice." 765 ILCS § 1075/5. "Commercial purpose" is defined in part, as "the public use or holding out of an individual's identity (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; (ii) for purposes of advertising or promoting products, merchandise, goods, or services; or (iii) for the purpose of fundraising." *Id.*

23. IRPA prohibits the use of an individual's identity for commercial purposes without first obtaining prior written consent. 765 ILCS § 1075/30. IRPA provides that a violation of the Act may result in statutory damages in the amount of $1,000 per violation or actual damages and profits derived from the unauthorized use, whichever is greater. 765 ILCS § 1075/40. IRPA further provides that punitive damages may be rewarded for willful violations and authorizes the issuance of injunctive relief where appropriate. 765 ILCS § 1075/40 & 50.

## CALIFORNIA CIVIL CODE § 3344

24. Pursuant to California Civil Code § 3344, the use of another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of products, merchandise, goods or services, without such person's prior consent is prohibited.

25. Section 3344 provides for damages for a violation in an amount equal to the greater of $750 or the actual damages suffered as a result of the unauthorized use. Punitive damages may also be awarded, as well as attorneys' fees and costs.

**INDIANA CODE § 32-36-1 *et seq.***

26. Under Indiana's Publicity Code, an individual's name, voice, signature, photograph, image, likeness, distinctive appearance, gesture, or mannerism (*i.e.* "identity") is afforded protection from unauthorized commercial use provided the individual's identity has commercial value.[3] IC 32-36-1-6, 32-36-1-8. In other words, Indiana's Publicity Code protects an individual's right of publicity.

27. Section 32-36-1-8 of the Publicity Code prohibits the use of an individual's personality for a commercial purpose within Indiana without first obtaining prior written permission.

28. Section 32-36-1-10 of the Publicity Code provides for $1,000 or actual damages, whichever is greater, for violations of the Code and treble or punitive damages if the violation is "knowing, willful, or intentional." The Indiana statute further provides for injunctive relief. IC § 32-36-1-12

**ALABAMA RIGHT OF PUBLICITY ACT – Ala. Code § 6-5-770 *et seq.***

29. ARPA protects "those attributes of a person that serve to identify that person to an ordinary viewer or listener, including, but not limited to name, signature, [or] …. likeness." AL ST § 6-5-772.

30. ARPA prohibits the use of an individual's identity "for purposes of advertising or selling, or soliciting purchases of, products, goods, merchandise, or services …. without consent." AL ST § 6-5-772.

31. Any person who establishes a violation of ARPA shall be eligible to receive: (i) statutory damages of $5,000 per action or compensatory damages including the Defendants'

[3] The Code defines and refers to such "identity" as "personality." *See* IC 32-36-1-6.

profits, (ii) any other damages available under Alabama law, including punitive damages and (iii) injunctive relief. Al St § 6-5-774. Liability attaches whether the use is for profit or not. AL ST § 6-5-772.

## FACTUAL ALLEGATIONS

32. BatchService is a real estate software company that offers solutions for property management and investment management. BatchService functions as a data broker, aggregating property, mortgage, transaction, and owner contact information from public records and other sources and making that information available to real estate professionals through paid subscriptions. The company offers BatchLeads, a property research website that offers reports for commercial and residential properties, including ownership details, property values, and sales history to subscribers of its website.

33. Equimine is a "real estate data and analytics platform." On July 7, 2025, it announced the acquisition of BatchLeads. Noting that as a result of the acquisition "[u]sers of both PropStream and BatchLeads will gain access to best-in-class nationwide data intelligence, enhanced lead targeting and a unified outreach platform via voice, email and direct mail, all under one roof."[4]

34. Equimine is registered as a data broker with the California Privacy Protection Agency, reflecting the commercial nature of its data-related activities. Through this registration, Equimine acknowledges that it gathers personal information about consumers with whom it has no direct relationship and engages in the sale or licensing of such information for commercial purposes. This status clearly brings Equimine within the scope of California's regulatory regime governing entities that operate by monetizing personal data.

---

[4] Information from Equimine's website at https://www.propstream.com/news, last visited on September 15, 2025.

35. BatchLeads is available to users residing in all states, including those residing in Illinois, California, Indiana, and Alabama. On information and belief, users of BatchLeads have used the website in each of those states, among other states both during the free trial and under a paid subscription.

36. As can be seen in the image below, the BatchLeads platform allows users to sign up for a 7-day free trial, which enables them to search for properties by entering a location and utilizing a searchable map.



37. As seen in the image below (with the owner's name redacted for the purposes of this Amended Complaint), the free property report contains the owner's full name and physical address. In addition, the owner's contact information (Phone and Email) are provided (blurred here).




38. Users are then prompted to click "save" to view the owner's contact information.

39. Once a user saves contact information, it is revealed and added to the user's "list."

40. During the free trial, BatchLeads emails users informing them that the free trial "may be ending" and encourages them to purchase a plan "upgrade." An image of the email is provided below.


BATCHLEADS

Log In

UPGRADE AND SAVE 40%

Hi [redacted],

Your free trial of BatchLeads may be ending, but this is only the beginning of your journey to finding quality leads, accurate phone numbers, and closing more deals.

**In case you weren't aware, here's everything BatchLeads can help you unlock:**

✅ **Save and manage 10,000+ leads every month** to keep your pipeline full
✅ **Import unlimited outside lists during your first month, with phone numbers included**
✅ **Use BatchRankAI and Quick Filters** to spot motivated sellers instantly
✅ **Run property comps** directly inside BatchLeads to make smarter offers faster
✅ **Drive for Dollars (D4D) or go Virtual D4D** to find hidden opportunities on the move
✅ **Work from anywhere** with the BatchLeads Mobile App — search, save, and call leads seamlessly

**Plus:** Lock in **up to 40% savings** when you upgrade to a yearly plan today.

Upgrade & Save Now

41. The purpose behind Defendants providing users with a free 7-day BatchLeads trial is to convince prospective customers to purchase subscriptions to BatchLeads. Stated differently, the free trial serves as a preview of the BatchLeads platform and features the type of information available, forming part of a commercial strategy mainly aimed at enticing users to commit to a monthly or yearly subscription.

42. Defendants offer a variety of BatchLead plans, with the "Growth" plan costing $119 a month (for "10k monthly leads" and "20k monthly exports" as well as "140+ customizable lead filters"), the "Professional" plan costing $349 a month (for "35k monthly leads" and "70k monthly exports"), the "Scale" plan costing $749 a month (for "75k monthly leads" and "150k monthly exports"), and the "Enterprise" plan offering custom prices (for "up to 1,000,000 leads/month"). For all plans, discounts are offered if a year is paid in full upfront. BatchLeads pricing is presented in the image below:




43. Defendants' BatchLeads platform is designed for commercial purposes and includes identifying information of Plaintiffs and Class Members. When users "save" contact information in a property report, the owners' identifying information, including their names, addresses, and cellular telephone numbers, are populated to users' "lists." The image below shows such a list (with phone numbers and names redacted for the purposes of this Amended Complaint).




44. These lists enable users to collect and use cellular numbers in high volumes for real estate solicitation. Users can select entries in a "list," export them, as well as "push them" to BatchDialer, an application that features "high-volume outbound calling" and a "multi-line dialer."

45. Furthermore, when users click an address on their list, they are presented with the property's report, which includes an option to call the owner directly from the BatchLeads platform. The image below captures a "Demo" from the BatchLeads website demonstrating this capability.




46. A BatchLeads subscription allows customers to access detailed information about not only a searched-for individual or property but also access to detailed information on all other

individuals included in the database. Furthermore, it allows customers to access a suite of marketing and outreach tools, including the BatchDialer, and other tools for direct marketing.

47. Information accessible on the BatchLeads platform is stored in an electronic database owned and maintained by Defendants. The inclusion of this information in their database demonstrates that Defendants knowingly collected, used, and/or held out this information, including identifying information of Plaintiffs, to users of the platform. Indeed, as data brokers, Defendants, by necessity, know that they are collecting and utilizing Plaintiffs' information in their database.

48. Notwithstanding their use of property owners' names and other identifying information to market subscriptions to the BatchLeads platform, Defendants do not request or obtain consent or written authorization from these individuals to do so.

**Facts Relating to Plaintiff Randall Miller (Illinois)**

49. As of July 2025, Randall Miller's identity was accessible through Defendants' BatchLeads platform. Indeed, a report for Miller's property is contained in the BatchLeads database, which includes his name as the property owner, property tax details, his gender, job title, email address, mobile phone number, additional telephone numbers, estimated income and net worth, a field indicating that he has children, and other personal information. This information is accessible through the search function on the platform and is sufficient to identify Miller.

50. Potential customers availing themselves of Defendants' free trial for the BatchLeads platform are able to view identifying information about Miller by "unlocking" his personal information using their free trial.

51. Defendants allow access to Miller's personal information contained on the BatchLeads platform to have potential customers familiarize themselves with the platform in the hope that those customers are incentivized to enter into paid subscriptions for continued access to

the platform. Thus, Miller's identity has been knowingly and deliberately used by Defendants for commercial purposes.

52. Miller has no relationship with Defendants and does not utilize or subscribe to BatchLeads.

53. Miller did not give consent, written or otherwise, to Defendants to use his name, likeness, personal information, cellular telephone number, or identity for their platform, or for any other reason. Nor did Miller provide Defendants with written consent to use his identity for commercial purposes, as required by Illinois law. Had Defendants requested his consent, Miller would not have provided it.

54. Defendants' knowing and deliberate use of Miller's identity to advertise subscriptions to their platform is misleading in that it gives the false impression that Miller is a willing participant in the platform, which he is not, and that he wants to receive unsolicited communications from sales professionals, marketers, and business development representatives, which he does not.

55. Miller has intellectual property interests in his name, likeness, and identity recognized by Illinois law. Miller has the right to exclude anyone from using his identity for commercial purposes without his written permission.

56. Defendants have injured Miller by knowingly and deliberately using his identity for their own commercial purposes without compensation or written permission in violation of Illinois's Right of Publicity statute, potentially subjecting him to harassing and uninvited sales communications.

57. The use of Miller's identity to advertise subscriptions to Defendants' BatchLeads platform demonstrates that his identity has value, to wit, its inclusion in the platform. Defendants' business model is dependent on Miller's identity, and others like it. Defendants derive value

through the accumulation of individual identities for their BatchLeads platform by (i) charging subscribers a monthly or yearly fee for access to those identities, and (ii) using the same identities for marketing purposes.

**Facts Relating to Plaintiff Isabel Sippo-Stockman (Illinois)**

58. As of August 2025, Isabel Sippo-Stockman discovered that her identity was accessible through Defendants' BatchLeads platform. Indeed, a report for Sippo-Stockman's property is contained in the BatchLeads database, which includes her name as the property owner, property tax details, purchase date of the property, her gender, estimated income and net worth, age, email addresses, mobile phone number, and other personal information. This information is accessible through the search function on the platform and is sufficient to identify Sippo-Stockman.

59. Potential customers availing themselves of Defendants' free trial for the BatchLeads platform are able to view identifying information about Sippo-Stockman by "unlocking" her personal information using their free trial.

60. Defendants allow access to Sippo-Stockman's personal information contained on the BatchLeads platform to have potential customers familiarize themselves with the platform in the hope that those customers are incentivized to enter into paid subscriptions for continued access to the platform. Thus, Sippo-Stockman's identity has been knowingly and deliberately used by Defendants for commercial purposes.

61. Sippo-Stockman has no relationship with Defendants and does not utilize or subscribe to their platform.

62. Sippo-Stockman did not give consent, written or otherwise, to Defendants to use her name, likeness, personal information, cellular telephone number, or identity for their platform, or for any other reason. Nor did Sippo-Stockman provide Defendants with written consent to use

her identity for commercial purposes, as required by Illinois law. Had Defendants requested her consent, Sippo-Stockman would not have provided it.

63. Defendants' knowing and deliberate use of Sippo-Stockman's identity to advertise subscriptions to their platform is misleading in that it gives the false impression that Sippo-Stockman is a willing participant in the platform, which she is not, and that she wants to receive unsolicited communications from sales professionals, marketers, and business development representatives, which she does not.

64. Sippo-Stockman has intellectual property interests in her name, likeness, and identity recognized by Illinois law. Sippo-Stockman has the right to exclude anyone from using her identity for commercial purposes without her written permission.

65. Defendants have injured Sippo-Stockman by knowingly and deliberately using her identity for their own commercial purposes without compensation or written permission in violation of Illinois's Right of Publicity statute, potentially subjecting her to harassing and uninvited sales communications.

66. The use of Sippo-Stockman's identity to advertise subscriptions to Defendants' BatchLeads platform demonstrates that her identity has value, to wit, its inclusion in the platform. Defendants' business model is dependent on Sippo-Stockman's identity, and others like it. Defendants derive value through the accumulation of individual identities for their BatchLeads platform by (i) charging subscribers a monthly or yearly fee for access to those identities, and (ii) using the same identities for marketing purposes.

**Facts Relating to Joseph Jackson (California)**

67. As of August 2025, Joseph Jackson's identity was accessible through Defendants' BatchLeads platform. Indeed, a report for Jackson's property is contained in the BatchLeads database, which includes his name as the property owner, the purchase date of the property,

purchase price of the property, property tax details, his gender, mobile telephone number, email addresses, estimated net worth, and other personal information. The report is accessible through the search function on the platform and is sufficient to identify Jackson.

68. Potential customers availing themselves of Defendants' free trial for the BatchLeads platform are able to view information on Jackson using their free trial.

69. Defendants allow access to the report of Jackson contained on their BatchLeads platform to have potential customers familiarize themselves with the platform in the hope that those customers are incentivized to enter into paid subscriptions for continued access to the platform. Thus, Jackson's identity has been knowingly and deliberately used by Defendants for commercial purposes.

70. Jackson has no relationship with Defendants and does not utilize or subscribe to their BatchLeads platform.

71. Jackson did not give consent, written or otherwise, to Defendants to use his identity for their BatchLeads platform, or for any other reason. Nor did Jackson provide Defendants with written consent to use his identity for commercial purposes. Had Defendants requested his consent, Jackson would not have provided it.

72. Jackson has intellectual property interests in his name, likeness, and identity recognized by California statutory law. Jackson has the right to exclude anyone from using his identity for commercial purposes without his permission.

73. Defendants' knowing and deliberate use of Jackson's identity to advertise subscriptions to BatchLeads is misleading in that it gives the false impression that Jackson is a willing participant in the platform, which he is not, and that he wants to receive unsolicited communications from parties such as real estate agents, property developers, and interested homebuyers, which he does not.

74. Defendants have injured Jackson by knowingly and deliberately using his name and likeness for their own commercial purposes without compensation or permission, potentially subjecting him to harassing and uninvited sales communications.

75. The use of Jackson's identity to advertise subscriptions to Defendants' BatchLeads platform demonstrates that his identity has value, to wit, its inclusion in the platform. Defendants' business model is dependent on Jackson's identity, and others like it. Defendants derive value through the accumulation of individual identities for their BatchLeads platform by (i) charging subscribers a monthly or yearly fee for access to those identities, and (ii) using the same identities for marketing purposes.

**Facts Relating to Benjamin Tate (California)**

76. As of October 2025, Benjamin Tate's identity was accessible through Defendants' BatchLeads platform. Indeed, a report for Tate's property is contained in the BatchLeads database which includes his name, the property address, purchase date of the property, property tax details, his gender, age, marital status, personal email addresses, telephone numbers, estimated income and net worth, and other personal information. The report is accessible through the search function on the platform and is sufficient to identify Tate.

77. Potential customers availing themselves of Defendants' free trial for the BatchLeads platform are able to view information on Tate using their free trial.

78. Defendants allow access to the report of Tate contained on their BatchLeads platform to have potential customers familiarize themselves with the platform in the hope that those customers are incentivized to either enter into paid subscriptions for continued access to the platform, or to purchase individual reports. Thus, Tate's identity has been knowingly and deliberately used by Defendants to market paid subscriptions to BatchLeads.

79. Tate has no relationship with Defendants and does not utilize or subscribe to their

BatchLeads platform.

80. Tate did not give consent, written or otherwise, to Defendants to use his identity for their BatchLeads platform, or for any other reason. Nor did Tate provide Defendants with written consent to use his identity for commercial purposes. Had Defendants requested his consent, Tate would not have provided it.

81. Tate has intellectual property interests in his name, likeness, and identity recognized by California statutory law. Tate has the right to exclude anyone from using his identity for commercial purposes without his permission.

82. Defendants' knowing and deliberate use of Tate's identity to advertise subscriptions to BatchLeads is misleading in that it gives the false impression that Tate is a willing participant in the platform, which he is not, and that he wants to receive unsolicited communications from parties such as real estate agents, property developers, and interested homebuyers, which he does not.

83. Defendants have injured Tate by knowingly and deliberately using his name and likeness for their own commercial purposes without compensation or permission, potentially subjecting his to harassing and uninvited sales communications.

84. The use of Tate's identity to advertise subscriptions to Defendants' BatchLeads platform demonstrates that his identity has value, to wit, its inclusion in the platform. Defendants' business model is dependent on Tate's identity, and others like it. Defendants derive value through the accumulation of individual identities for their BatchLeads platform by (i) charging subscribers a monthly or yearly fee for access to those identities, and (ii) using the same identities for marketing purposes.

**Facts Relating to Brandy Garner (Indiana)**

85. As of August 2025, Brandy Garner's identity was accessible through Defendants'

BatchLeads platform. Indeed, a report for Garner's property is contained in the BatchLeads database, which includes her name as the property owner, the property address, purchase date of the property, purchase price of the property, property tax details, her gender, mobile telephone number, her email address, a field indicating whether she has children, a field indicating that she is a single parent, her estimated income and net worth, and other personal information. The report is accessible through the search function on the platform and is sufficient to identify Garner.

86. Potential customers availing themselves of Defendants' free trial for the BatchLeads platform, including those residing in Indiana, are able to view information on Garner using their free trial.

87. Defendants allow access to the report of Garner contained on their BatchLeads platform to have potential customers familiarize themselves with the platform in the hope that those customers are incentivized to enter into paid subscriptions for continued access to the platform. Thus, Garner's identity has been knowingly and deliberately used by Defendants to market paid subscriptions to BatchLeads.

88. Based on the scope of the BatchLeads platform and the number of properties contained therein, Garner contends that her identity was used by Defendants to advertise subscription services to BatchLeads in Indiana.

89. Garner has no relationship with Defendants and does not utilize or subscribe to their BatchLeads platform.

90. Garner did not give consent, written or otherwise, to Defendants to use her identity for their BatchLeads platform, or for any other reason. Nor did Garner provide Defendants with written consent to use her identity for commercial purposes. Had Defendants requested her consent, Garner would not have provided it.

91. Garner has intellectual property interests in her name, likeness, and identity recognized by Indiana statutory law. Garner has the right to exclude anyone from using her identity for commercial purposes without her written permission.

92. Defendants' knowing and deliberate use of Garner's identity to advertise subscriptions to BatchLeads is misleading in that it gives the false impression that Garner is a willing participant in the platform, which she is not, and that she wants to receive unsolicited communications from parties such as real estate agents, property developers, and interested homebuyers, which she does not.

93. Defendants have injured Garner by knowingly and deliberately using her name and likeness in Indiana and elsewhere for their own commercial purposes without compensation or permission, potentially subjecting her to harassing and uninvited sales communications.

94. The use of Garner's identity to advertise subscriptions to Defendants' BatchLeads platform demonstrates that her identity has value, to wit, its inclusion in the platform. Defendants' business model is dependent on Garner's identity, and others like it. Defendants derive value through the accumulation of individual identities for their BatchLeads platform by (i) charging subscribers a monthly or yearly fee for access to those identities, and (ii) using the same identities for marketing purposes.

**Facts Relating to Plaintiff Stephen Pritchett (Indiana)**

95. As of October 2025, Stephen Pritchett's identity was accessible through Defendants' BatchLeads platform. Indeed, a report for Pritchett's property is contained in the BatchLeads database, which includes his name as the property owner, the property address, purchase date of the property, purchase price of the property, mobile telephone number, his email address, and other personal information. The report is accessible through the search function on the platform and is sufficient to identify Pritchett.

96. Potential customers availing themselves of Defendants' free trial for the BatchLeads platform, including those residing in Indiana, are able to view information on Pritchett using their free trial.

97. Defendants allow access to the report of Pritchett contained on their BatchLeads platform to have potential customers familiarize themselves with the platform in the hope that those customers are incentivized to enter into paid subscriptions for continued access to the platform. Thus, Pritchett's identity has been knowingly and deliberately used by Defendants to market paid subscriptions to BatchLeads.

98. Based on the scope of the BatchLeads platform and the number of properties contained therein, Pritchett contends that his identity was used by Defendants to advertise subscription services to BatchLeads in Indiana.

99. Pritchett has no relationship with Defendants and does not utilize or subscribe to their BatchLeads platform.

100. Pritchett did not give consent, written or otherwise, to Defendants to use his identity for their BatchLeads platform, or for any other reason. Nor did Pritchett provide Defendants with written consent to use his identity for commercial purposes. Had Defendants requested her consent, Pritchett would not have provided it.

101. Pritchett has intellectual property interests in his name, likeness, and identity recognized by Indiana statutory law. Pritchett has the right to exclude anyone from using his identity for commercial purposes without his written permission.

102. Defendants' knowing and deliberate use of Pritchett's identity to advertise subscriptions to BatchLeads is misleading in that it gives the false impression that Garner is a willing participant in the platform, which he is not, and that he wants to receive unsolicited

communications from parties such as real estate agents, property developers, and interested homebuyers, which he does not.

103. Defendants have injured Pritchett by knowingly and deliberately using his name and likeness in Indiana and elsewhere for their own commercial purposes without compensation or permission, potentially subjecting him to harassing and uninvited sales communications.

104. The use of Pritchett's identity to advertise subscriptions to Defendants' BatchLeads platform demonstrates that his identity has value, to wit, its inclusion in the platform. Defendants' business model is dependent on Pritchett's identity, and others like it. Defendants derive value through the accumulation of individual identities for their BatchLeads platform by (i) charging subscribers a monthly or yearly fee for access to those identities, and (ii) using the same identities for marketing purposes.

**Facts Relating to Plaintiff Samira Segreti (Alabama)**

105. As of August 2025, Samira Segreti's identity was accessible through Defendants' BatchLeads platform. Indeed, a report for Segreti's property is contained in the BatchLeads database, which includes her name as the property owner, the property address, purchase date of the property, purchase price of the property, property tax details, her gender, personal email addresses, a field indicating whether she has children, and other personal information. The report is accessible through the search function on the platform and is sufficient to identify Segreti.

106. Potential customers availing themselves of Defendants' free trial for the BatchLeads platform are able to view information on Segreti using their free trial.

107. Defendants allow access to the report of Segreti contained on their BatchLeads platform to have potential customers, including those in Alabama, familiarize themselves with the platform in the hope that those customers are incentivized to either enter into paid subscriptions for continued access to the platform, or to purchase individual reports. Thus, Segreti's identity has

been knowingly and deliberately used by Defendants to market paid subscriptions to BatchLeads.

108. Based on the scope of the BatchLeads platform and the number of properties contained therein, Segreti contends that her identity was used by Defendants to advertise subscription services to BatchLeads in Alabama.

109. Segreti has no relationship with Defendants and does not utilize or subscribe to their BatchLeads platform.

110. Segreti did not give consent, written or otherwise, to Defendants to use her identity for their BatchLeads platform, or for any other reason. Nor did Segreti provide Defendants with written consent to use her identity for commercial purposes. Had Defendants requested her consent, Segreti would not have provided it.

111. Segreti has intellectual property interests in her name, likeness, and identity recognized by ARPA. Segreti has the right to exclude anyone from using her identity for commercial purposes without her permission.

112. Defendants' knowing and deliberate use of Segreti's identity to advertise subscriptions to BatchLeads is misleading in that it gives the false impression that Segreti is a willing participant in the platform, which she is not, and that she wants to receive unsolicited communications from parties such as real estate agents, property developers, and interested homebuyers, which she does not.

113. Defendants have injured Segreti by knowingly and deliberately using her name and likeness in Alabama and elsewhere for their own commercial purposes without compensation or permission, potentially subjecting her to harassing and uninvited sales communications.

114. The use of Segreti's identity to advertise subscriptions to Defendants' BatchLeads platform demonstrates that her identity has value, to wit, its inclusion in the platform. Defendants' business model is dependent on Segreti's identity, and others like it. Defendants derive value

through the accumulation of individual identities for their BatchLeads platform by (i) charging subscribers a monthly or yearly fee for access to those identities, and (ii) using the same identities for marketing purposes.

**Facts Relating to Rex Waer (Alabama)**

115. As of September 2025, Rex Waer's identity was accessible through Defendants' BatchLeads platform. Indeed, a report for Waer's property is contained in the BatchLeads database which includes his name as the property owner, the property address, purchase price of the property, purchase date of the property, property tax details, and his telephone number. The report is accessible through the search function on the platform and is sufficient to identify Waer.

116. Potential customers availing themselves of Defendants' free trial for the BatchLeads platform are able to view information on Waer using their free trial.

117. Defendants allow access to the report of Waer contained on their BatchLeads platform to have potential customers, including those in Alabama, familiarize themselves with the platform in the hope that those customers are incentivized to either enter into paid subscriptions for continued access to the platform, or to purchase individual reports. Thus, Waer's identity has been knowingly and deliberately used by Defendants to market paid subscriptions to BatchLeads.

118. Based on the scope of the BatchLeads platform and the number of properties contained therein, Waer contends that his identity was used by Defendants to advertise subscription services to BatchLeads in Alabama.

119. Waer has no relationship with Defendants and does not utilize or subscribe to their BatchLeads platform.

120. Waer did not give consent, written or otherwise, to Defendants to use his persona for their BatchLeads platform, or for any other reason. Nor did Waer provide Defendants with

written consent to use his identity for commercial purposes. Had Defendants requested his consent, Waer would not have provided it.

121. Waer has intellectual property interests in his name, likeness, and identity recognized by ARPA. Waer has the right to exclude anyone from using his identity for commercial purposes without his permission.

122. Defendants' knowing and deliberate use of Waer's identity to advertise subscriptions to BatchLeads is misleading in that it gives the false impression that Waer is a willing participant in the platform, which he is not, and that he wants to receive unsolicited communications from parties such as real estate agents, property developers, and interested homebuyers, which he does not.

123. Defendants have injured Waer by knowingly and deliberately using his name and likeness in Alabama and elsewhere for their own commercial purposes without compensation or permission, potentially subjecting him to harassing and uninvited sales communications.

124. The use of Waer's identity to advertise subscriptions to Defendants' BatchLeads platform demonstrates that his identity has value, to wit, its inclusion in the platform. Defendants' business model is dependent on Waer's identity, and others like it. Defendants derive value through the accumulation of individual identities for their BatchLeads platform by (i) charging subscribers a monthly or yearly fee for access to those identities, and (ii) using the same identities for marketing purposes.

## CLASS ALLEGATIONS

125. Plaintiffs bring this class action on behalf of themselves and the following classes listed below pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3),

126. Each of the Plaintiffs seeks to represent a class of individuals comprised of citizens and residents of the state from which they are citizens and residents. These respective classes are defined as follows:

> **A. Illinois Class:** All current and former Illinois residents who are not subscribers to Defendants' BatchLeads platform and whose identity is used to market paid subscriptions for Defendants' BatchLeads platform.
>
> **B. California Class:** All current and former California residents who are not subscribers to Defendants' BatchLeads Platform and whose identity is used to market paid subscriptions for Defendants' BatchLeads platform.
>
> **C. Indiana Class:** All current and former Indiana residents who are not subscribers to Defendants' BatchLeads platform and whose identity is used to market paid subscriptions for Defendants' BatchLeads platform in Indiana.
>
> **D. Alabama Class:** All current and former Alabama residents who are not subscribers to Defendants' BatchLeads platform and whose identity is used to market paid subscriptions for Defendants' BatchLeads platform in Alabama.

127. Excluded from the Classes are Defendants, their officers, directors, shareholders, members, managers, employees, attorneys (and attorney family members), and members of the Illinois judiciary. Plaintiffs reserve the right to amend the Class definition upon completion of class discovery when the contours and the parameters of the Class become more apparent.

128. **Numerosity (Fed. R. Civ. P 23(a)(1))**. The members of the Classes are so numerous that joinder of all members is impractical. Based on the investigation by their counsel and representations made by Defendants about their BatchLeads platform, Plaintiffs reasonably believe that each Class comprises thousands of current and former residents of Illinois, California, Indiana, and Alabama whose identities are contained in and/or viewable on the platform. The platform contains over 2.45 million Illinois residents' information alone, and similar numbers are likely available for the other states. The exact number of persons in each Class can be determined

from records maintained by Defendants, but certainly exceeds 40 persons for each Class, and is estimated to be in the thousands for each state.

129. **Commonality (Fed. R. Civ. P. 23(a)(2))**. There are many common questions of law and fact that exist as to Plaintiffs and members of the Classes, and those questions substantially predominate over any questions that may affect individual Class members. Common questions of fact and law include, but are not limited to

(a) whether Defendants use Plaintiffs' and Class Members' identities in property search reports for their own commercial benefit;

(b) whether Defendants obtained consent from Plaintiffs and the Classes prior to using their identities to promote their platform as required by the respective state statutes;

(c) whether the conduct described herein constitutes a violation of the right of publicity statutes for Illinois, California, Indiana, and Alabama;

(d) whether Defendants' violations of the various right of publicity statutes were willful, which would entitle Plaintiffs and the Classes to punitive damages; and

(e) whether Plaintiffs and Class Members are entitled to declaratory, injunctive, and monetary relief as requested.

130. **Typicality (Fed. R. Civ. P. 23(a)(3))**. Plaintiffs' claims are typical of the claims of the members of the Classes. Defendants' misuse of Plaintiffs' and Class Members' identities, personal information, and other identifying information was the same for each.

131. **Fair and Adequate Representation (Fed. R. Civ. P. 23(a)(4))**. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained competent counsel experienced in class action litigation in state and federal courts nationwide,

and Plaintiffs have no interest adverse to any member of the Class. Plaintiffs intend to prosecute this case vigorously on behalf of themselves and the Class.

132. **Injunctive and/or Declaratory Relief (Fed. R. Civ. P. 23(b)(2)).** As demonstrated above, Lifetime has acted on grounds generally applicable to the proposed Classes such that final injunctive relief is appropriate with respect to each Class as a whole.

133. **Predominance and Superiority (Fed. R. Civ. P. 23(b)(3))**. Common questions of law and fact predominate over any questions affecting only individual members, and a class action is superior to other methods for the fair and efficient adjudication of the controversy because:

(a) Proof of Defendants' liability on Plaintiffs' claims will also prove liability for the claims of the Classes without the need for separate or individualized proceedings;

(b) Evidence regarding defenses or any exceptions to liability that Defendants may assert and attempt to prove will come from Defendants' records and will not require individualized or separate inquiries or proceedings;

(c) Defendants have acted and are continuing to act pursuant to common policies or practices in the same or similar manner with respect to all Class Members;

(d) The injury suffered by each Class Member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Defendants economically feasible. Even if Class Members could afford individual litigation, those actions would put immeasurable strain on the court system. A class action, on the other hand, will permit a large number of claims involving virtually identical facts and legal issues to be resolved efficiently in one

proceeding based upon common proofs, without the risk of inconsistent judgments; and

(e) This case is inherently manageable as a class action in that:

(i) Defendants' records will enable Plaintiffs to readily identify members and establish liability and damages;

(ii) Liability and damages can be established for Plaintiffs and the Class with the same common proofs;

(iii) A class action will result in an orderly and expeditious administration of claims, and it will foster economies of time, effort, and expense;

(iv) A class action will contribute to uniformity of decisions concerning Defendants' practices; and

(v) As a practical matter, the claims of the Classes are likely to go unaddressed absent class certification.

**COUNT I—VIOLATION OF ILLINOIS RIGHT OF PUBLICITY ACT**
**(on behalf of the Illinois Class)**

134. Plaintiffs Miller and Sippo-Stockman incorporate by reference the allegations contained in paragraphs 1-66 and 125-133 of this Complaint.

135. As stated, the Illinois Right of Publicity Act ("IRPA") defines "right of publicity" as the "right to control and to choose whether and how to use an individual's identity for commercial purposes." 765 ILCS § 1075/10.

136. IRPA prohibits and provides a private right of action and damages for using an individual's identity for commercial purposes without first obtaining written consent. 765 ILCS § 1075/30.

137. By engaging in the foregoing acts and omissions, Defendants knowingly and deliberately used the identities of Miller, Sippo-Stockman, and Illinois Class Members for commercial purposes without obtaining written consent.

138. Each use of Miller's, Sippo-Stockman's, and Illinois Class Members' identities through Defendants' platform to market paid subscriptions is a separate and distinct violation of IRPA giving rise to damages.

139. Under IRPA, Defendants are liable for the greater of: (i) statutory damages in the amount of $1,000 per violation; or (ii) the sum of "actual damages" and "profits derived from the unauthorized use." 765 ILCS § 1075/40. IRPA also provides for punitive damages if the violation is willful and injunctive relief. 765 ILCS § 1075/40 & 50.

140. As a result of Defendants' violations of IRPA, Miller, Sippo-Stockman, and the Illinois Class have suffered injury to their publicity rights and economic damages. Miller, Sippo-Stockman, and Illinois Class Members have been denied the commercial value of their identities, which Defendants knowingly and deliberately used without permission from or compensation to Miller, Sippo-Stockman, and Illinois Class Members. Miller, Sippo-Stockman, and Illinois Class Members were denied their statutorily protected right to control how their identities are used and suffered damages based on that misuse.

141. Miller and Sippo-Stockman, on behalf of themselves and the Illinois Class, seek: statutory damages for each violation of IRPA, or alternatively, actual damages and profits derived from the unauthorized use of their identities, whichever is greater; punitive damages if it is found that Defendants' actions were willful; prejudgment interest; injunctive and declaratory relief; and an award of attorneys' fees and costs.

**COUNT II—VIOLATION OF CALIFORNIA CIVIL CODE, §3344 *et seq.***
**(on behalf of the California Class)**

142. Plaintiffs Jackson and Tate incorporate by reference the allegations contained in paragraphs 1-48, 67-84, and 125-133 of this Complaint.

143. As stated, California's Right of Publicity Statute, California Civil Code § 3344, prohibits the knowing use of "another's name, voice, signature, photograph, or likeness, in any manner . . . without such person's prior consent." Cal. Civ. Code § 3344.

144. Section 3344 provides for damages for any such violation in the amount of $750 or the actual damages suffered on account of the unauthorized use. It also provides for the possibility of an award for punitive damages. *Id.*

145. By engaging in the foregoing acts and omissions, Defendants knowingly and deliberately used the identities of Jackson, Tate, and California Class Members' identities for commercial purposes without first obtaining prior consent. The use of Jackson's, Tate's, and California Class Members' personalities in this manner demonstrates that they have commercial value.

146. Each use of Jackson's, Tate's, and California Class Members' identities is a separate and distinct violation of section 3344 giving rise to damages.

147. As a result of Defendants' violations, Jackson, Tate, and California Class Members have suffered injury to their publicity rights as well as economic damages. Jackson, Tate, and the California Class Members have been denied the commercial value of their identities, which Defendants knowingly and deliberately used without permission from or compensation to Jackson, Tate, and California Class Members. Jackson, Tate, and California Class Members were denied their statutorily protected right to control how their identities are used and suffered damages based on that misuse.

148. Jackson and Tate, on behalf of themselves and the California Class, seek statutory damages for each violation of section 3344, or alternatively, actual damages suffered for the unauthorized use, whichever is greater; punitive damages, if warranted; prejudgment interest; injunctive and declaratory relief; and an award of attorneys' fees and costs.

**COUNT III—VIOLATION OF INDIANA PUBLICITY STATUTE**
**(on behalf of the Indiana Class)**

149. Plaintiffs Garner and Pritchett incorporate by reference the allegations contained in paragraphs 1-48, 85-104, and 125-133 of this Complaint.

150. As stated, Indiana's Publicity Code, IC § 32-36-1-8, prohibits the commercial use of an individual's "personality," which includes the individual's name and other identifying characteristics, so long as they have value, without written consent.

151. Section 32-36-1-10 of the Code provides for $1,000 or actual damages, whichever is greater, and treble or punitive damages if the violation is "knowing, willful, or intentional." The Indiana statute further provides for injunctive relief. IC § 32-36-1-12.

152. By engaging in the foregoing acts and omissions, Defendants knowingly and deliberately used Garner's, Pritchett's, and Indiana Class Members' personalities for commercial purposes, in Indiana and elsewhere, without first obtaining written consent.

153. The personalities of Garner, Pritchett, and Indiana Class Members have commercial value since they are used by Defendants to create and market their BatchLeads platform.

154. Each use of Garner's, Pritchett's, and Indiana Class Members' personalities is a separate and distinct violation giving rise to damages.

155. As a result of Defendants' violations, Garner, Pritchett's, and the Indiana Class have suffered injury to their publicity rights as well as economic damages. Garner, Pritchett, and

the Indiana Class Members have been denied the commercial value of their personalities, which Defendants knowingly and deliberately used without permission from or compensation to Garner, Pritchett, and Indiana Class Members. Garner, Pritchett, and Indiana Class Members were denied their statutorily protected right to control how their personalities are used and suffered damages based on that misuse.

156. Garner and Pritchett, on behalf of themselves and the Indiana Class, seek damages for each violation of IC § 32-36-1-8; treble or punitive damages, if warranted; prejudgment interest; injunctive and declaratory relief; and an award of attorneys' fees and costs.

**COUNT IV—VIOLATION OF ALABAMA RIGHT OF PUBLICITY STATUTE**
**(on behalf of the Alabama Class)**

157. Plaintiffs Segreti and Waer incorporate by reference the allegations contained in paragraphs 1-48 and 105-133 of this Complaint.

158. As stated, ARPA prohibits the use of an individual's identity "for purposes of advertising or selling, or soliciting purchases of, products, goods, merchandise, or services . . . without consent." AL ST § 6-5-772.

159. Any person who establishes a violation of ARPA shall be eligible to receive: (i) statutory damages of $5,000 per action or compensatory damages including the Defendants' profits, (ii) any other damages available under Alabama law, including punitive damages and (iii) injunctive relief. AL ST § 6-5-774. Liability attaches whether the use is for profit or not. AL ST § 6-5-772.

160. By engaging in the foregoing acts and omissions, Defendants knowingly and deliberately used the identities of Segreti, Waer, and Alabama Class Members for commercial purposes, in Alabama and elsewhere, without first obtaining prior consent.

161. The identities of Segreti, Waer, and Alabama Class Members have commercial value since they are used to by Defendants to create and market their BatchLeads platform.

162. Each use of Segreti's, Waer's, and Alabama Class Members' identities is a separate and distinct violation of ARPA.

163. As a result of Defendants' violations, Segreti, Waer, and the Alabama Class have suffered injury to their publicity rights as well as economic damages. Segreti, Waer, and the Alabama Class Members have been denied the commercial value of their identities, which Defendants knowingly and deliberately used without permission from or compensation to Segreti, Waer, and the Alabama Class. Segreti, Waer, and Alabama Class Members were denied their statutorily protected right to control how their identities are used and suffered damages based on that misuse.

164. Segreti and Waer, on behalf of themselves and the Alabama Class, seek damages for each violation of ARPA in the amount of $5,000 per action, or compensatory damages including the Defendants' profits; any other damages available under Alabama law, including punitive damages; injunctive relief; prejudgment interest; and an award of attorneys' fees and costs.

**WHEREFORE**, Plaintiffs Randall Miller, Isabel Sippo-Stockman, Joseph Jackson, Brandy Garner, Stephen Pritchett, Samira Segreti, Benjamin Tate, and Rex Waer individually and on behalf of all other similarly situated persons, demand judgment in their favor and against Defendants as follows:

A. Certifying this case as a class action and appointing Plaintiffs and their attorneys as class representatives and class counsel, respectively;

B. Declaring that Defendants' actions, as described herein, violate the right of

publicity statutes in Illinois, California, Indiana, and Alabama;

C. Awarding statutory damages to Plaintiffs and the Classes for each violation of the respective statutes, or, alternatively, actual damages and profits derived from the unauthorized use of Plaintiffs' and Class Members' identities, whichever is greater, plus prejudgment interest;

D. Awarding punitive or exemplary damages to Plaintiffs and the Classes for each violation of the respective statutes, if appropriate;

E. Enjoining Defendants from committing further violations of Plaintiffs' and Class Members right of publicity;

F. Awarding Plaintiffs reasonable attorneys' fees and costs incurred in filing and prosecuting this action; and

G. Awarding such other and further relief as this Court deems appropriate and just.

Randall Miller, Isabel Sippo-Stockman, Joseph Jackson, Brandy Garner, Stephen Pritchett, Samira Segreti, Benjamin Tate, and Rex Waer, individually and as the representatives of classes of similarly-situated persons,

*/s/ Patrick J. Solberg*
One of Plaintiffs' Attorneys
Patrick J. Solberg
Brian J. Wanca
Wallace C. Solberg
ANDERSON + WANCA
DuPage Firm ID: #11575
3701 Algonquin Road
Suite 500
Rolling Meadows, IL 60008
psolberg@andersonwanca.com
bwanca@andersonwanca.com
wsolberg@andersonwanca.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 31, 2025, a true and correct copy of the foregoing Initial Status Report for New Case was e-filed and served on all counsel of record using the Court's CM/ECF system.

/s/ Patrick J. Solberg